# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| PORCIA HALE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 05 C 3605 |
| ) | |
| JO ANNE BARNHART, ) | Judge Rebecca R. Pallmeyer |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Porcia Hale sought disability insurance benefits from the Social Security Administration ("SSA"). She claimed that she was unable to work due to arthritis in her right hip and knee, chronic obstructive pulmonary disease ("COPD"), asthma, hypertension, hyperthyroidism. Defendant Jo Ann B. Barnhart, the Commissioner for Social Security, rendered a final decision denying Hale's application in April of 2005. Hale then filed this action, seeking review pursuant to 42 U.S.C. § 405(g).

Now before the court are the parties' cross-motions for summary judgment. For the reasons stated below, the Commissioner's motion for summary judgment is denied, Hale's motion is granted, and the case is remanded to the SSA under sentence four of § 405(g).

## BACKGROUND

The following facts are drawn from the Administrative Record, including the transcript of a hearing before Administrative Law Judge Edward R. Gustafson on January 21, 2005.

Hale worked as a secretary at West Suburban Hospital from 1980 through June 12, 2002. (R. at 75.) In her initial application for benefits, Hale stated that she became unable to work due to her disabilities in May of 2002, but also stated that the reason her employment ended a month later was "downsizing." (*Id.* at 74.) She claimed that she was limited in her ability to work because she suffered from (1) COPD, (2) asthma, (3) "HTN" (hypertension), (4) hyperthyroidism, and (5)

arthritis in her right hip and knee. (*Id.*)

**Shortness of Breath**

Hale smoked a pack and a half of cigarettes a day for thirty years, and continued to smoke as of the date of the hearing. (R. at 217.) She was diagnosed with asthma by Dr. Horras in 2001 during a brief period of hospitalization for shortness of breath. (*Id.* at 111.) Dr. Judy Law reported that Hale suffered from asthma on a Pulmonary Residual Functional Capacity ("RFC") Questionnaire, which Dr. Law completed in March of 2003, based on an April 2002 examination. (*Id.* at 156). Although she did not list asthma as a diagnosis on the front page of the questionnaire (*id.* at 155), she identified "episodic acute asthma" as one of Hale's symptoms, noting that attacks could be caused by upper respiratory infections and cold or changeable weather. (*Id.* at 156.) She noted that Hale had "daily mild attacks," that an average attack might incapacitate Hale for "a few weeks," and that Hale's attacks could be so serious that "she needed hospitalization." (*Id.*)

At the administrative hearing, Dr. Ernest Mond testified as a medical expert. (R. at 212, 226.) Based on the evidence, Dr. Mond could not say for sure whether Hale suffered from asthma, from emphysema, or both. (*Id.* at 226.) He was also unsure whether she suffered from COPD. (*Id.*)

In order to treat her shortness of breath, Hale takes Albuterol and Serevent.[1] (*Id.*) She was given an oxygen machine for home use in April of 2001. (*Id.* at 114.) During the administrative hearing in January of 2005, she testified that she had been taking oxygen at night and sometimes during the day for about a year (*id.* at 224); this was corroborated by notes from her visits with physicians during that period. (*Id.* at 196, 209.) Hale claims that her condition is exacerbated by

---

[1] Albuterol is an inhalation aerosol used to treat COPD and asthma; it works by relaxing and opening air passages in the lungs, making breathing easier. *See* MedlinePlus Drug Information, Albuterol Inhalation (2007), http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682145.html. Serevent is a brand name for salmeterol, which is also used to make breathing easier for sufferers of asthma and COPD. *Id.* at Salmeterol Oral Inhalation (2006), http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695001.html

significant exertion, or by exposure to temperature extremes or strong fumes and odors. (*Id.* at 133-34.)

Hale was admitted to West Suburban Medical Center on April 26, 2001 due to an asthma attack. (R. at 111.) When she arrived at the hospital, the emergency room physician listed his impressions as including "acute bronchospasms with R [right] pneumonitis and hypoxia [a shortage of oxygen in the body]." (*Id.*) The next day, Dr. Kakan Naha conducted a pulmonary function study. (*Id.* at 123.) During this evaluation, Hale had a forced expiratory volume in 1 second ("FEV1") of 1.09 liters.[2] (*Id.*) Dr. Naha performed this test more than a year before Hale claimed to have become disabled.

On November 30, 2002, Dr. James A. Runke performed another pulmonary function study as part of a consultative examination to determine whether Hale was entitled to disability benefits. (R. at 133, 140.) Dr. Runke recorded a FEV1 of 1.33 L. (*Id.* at 140.) He noted, however, that he was unable to complete the testing because "worsening cough, dizziness, wheezing and [shortness of breath] . . . led to termination of [the] test." (*Id.*)

Finally, there is evidence in the administrative record of a third pulmonary function test. A document labeled Outpatient Progress Notes includes a notation indicating that an unknown physician recorded an FEV1 value of 1.44 L for Hale in April of 2003. (R. at 196, 227.)

At the administrative hearing, Dr. Mond testified that the first test (in April 2001) was not valid because Hale had pneumonia when it was administered. (*Id.* at 227.) He testified further that the second test (November 2002) was stopped before it could produce "the best values" because Hale was coughing and exerting herself during the test. (*Id.*) He then referred to the final test (April

---

[2]     FEV1 is the key measurement by which the SSA determines whether an individual's COPD is so severe that she is presumptively disabled, regardless of her residual functional capacity. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d); Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App. 1, § 302(A) (hereinafter "Listing of Imps.") (for a person of Hale's height, which is 66 inches, COPD becomes presumptively disabling at a FEV1 value of 1.35 L or below).

2003), and did not mention any problems in relation to its administration.  (*Id.*)  He did not offer an ultimate opinion as to what Hale's valid FEV1 value would be (*id.*), nor did any other physician give an opinion, either via testimony or in Hale's medical records, regarding the comparative validity of the three tests.

**Hypertension**

Hale has a history of hypertension stretching back more than 20 years—long before she first claimed to be disabled.  (R. at 134.)

In November of 2003, when Dr. Angelito Bernardo performed a consultative examination to determine whether Hale was disabled, she told him that her hypertension was controlled and had never required an emergency room visit.  (R. at 134.)  At that date, Dr. Bernardo noted that her blood pressure was 200/110, which he described as "markedly elevated." (*Id.* at 135-36.)  She told him that she had skipped her blood pressure medication, and he advised her that she needed to take it, and that she needed to see a physician immediately in order to get her blood pressure under control.  (*Id.* at 135.)

At the administrative hearing, Dr. Mond testified that Hale's hypertension was controlled with hydrochlorothiazide and metoprolol,[3] which he described as "relatively minimal therapy."  (R. at 226.)  He also stated that there was "no evidence of end organ damage" as a result of the elevated pressure.  (*Id.*)

**Pulmonary Hypertension**

 Pulmonary hypertension is a condition of high blood pressure in the arteries that supply blood to the lungs, leading to an increased burden on the heart as well as possible hypoxia; it is

---

[3]  Hydrochlorothiazide is a diuretic, and metoprolol is a beta-blocker; they are used in combination to lower blood pressure.  *See* DrugDigest.org, Metoprolol and Hydrochlorothiazide (2006), http://www.drugdigest.org/DD/DVH/Uses/0,3915,6188%7CMetoprolol%2B and%2BHydrochlorothiazide,00.html.

distinct from ordinary hypertension, and more rare.[4]  Hale has a history of pulmonary hypertension.

On March 18, 2001, about a year before she claims to have become disabled, Dr. Kevin J. O'Donoghue conducted tests on Hale's pulmonary arteries.  (R. at 197.)  He measured a mean pulmonary arterial pressure of 36 mm HG.[5]  (*Id.* at 197, 228.)

Dr. Law prepared a Pulmonary RFC questionnaire for Hale's counsel on March 14, 2003, based upon an examination she conducted in April of 2002.[6]  (R. at 154-55, 161.)  On that questionnaire, she stated that she had diagnosed Hale as suffering from pulmonary hypertension, with a fair prognosis.  (*Id.* at 157.)  Dr. Law noted that Hale's symptoms were frequently severe enough to interfere with her concentration, and would markedly limit Hale's ability to cope with stress at work.  (*Id.* at 155.)  She noted that Hale could continuously stand for no more than fifteen minutes at a time, and could sit for about four hours total in a workday.  (*Id.* at 158.)  Finally, she noted that Hale's pulmonary hypertension was likely to cause her to miss about three days of work in any given month.  (*Id.* at 161.)

Dr. Mond discussed Hale's pulmonary hypertension at the hearing.  (R. at 227-28.)  He noted that the mean pulmonary arterial pressure of 36 did not satisfy the listing criteria, which is greater than 40 mm HG.  (*Id.* at 228.)  Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App. 1, § 3.09(A) (hereinafter "Listing of Imps.").  He also noted that although Dr. Law's evaluations on this subject were "very restrictive," he could not "quarrel with them," except to note that her

---

[4]     *See* Mayo Clinic Staff, Pulmonary Hypertension (2006), http://www.mayoclinic.com/ health/pulmonary-hypertension/DS00430.

[5]      In a normal pulmonary artery, the mean pressure would be about 14 mm HG when a person is at rest; when pulmonary arterial hypertension is present, the mean pressure is usually greater than 25 mm HG.  National Heart Lung & Blood Institute Diseases and Conditions Index, *What Is Pulmonary Arterial Hypertension?* (2006), http://www.nhlbi.nih.gov/health/dci/Diseases/ pah/pah_what.html.

[6]     Dr. Law's notes from that examination are included in the record, but they are cryptic and nearly illegible.  They do, however, include the following notation: "COPD + 1° pul HTN."  (R. at 129.)

observations on the questionnaire were of lessened force because they were based on an examination conducted almost one year earlier. (R. at 228.)

**Hip and Knee Arthritis**

During a consultative examination for the SSA in November of 2002, Hale complained to Dr. Bernardo of pain in her right hip and knee, and said that she was unable to walk well. (R. at 134.) She said that she had experienced this problem for many years, but that she "woke up one morning [two years ago] and just couldn't move." (*Id.*) She reported problems with walking, standing, and climbing stairs, but Dr. Bernardo found that her "activities of daily living are full." (*Id.*) Hale took Alleve (naproxen sodium) for pain relief; she also alleged having had medication injected into her right hip at some point, but she had no documentation of this. (*Id.*)

Dr. Bernardo noted that Hale limped and moved with "great discomfort." (R. at 135.) He also observed that her right knee was tender and swollen, that her right hip was tender, and that both had reduced ranges of motion. (*Id.* at 138.) An x-ray interpretation by Dr. Eugene Kovalsky, performed in conjunction with Dr. Bernardo's consultative examination, noted early degenerative changes at the right hip, which he described as "mild." (*Id.* at 145.) He also noted "no evidence" of any "fracture, dislocation, osseous or joint pathology" in the right knee. (*Id.*)

On the basis of the above evidence, Dr. William Conroy, in a February 27, 2003 Physical RFC assessment, stated that Hale could frequently lift or carry objects weighing twenty-five pounds, and could stand or walk for about six hours in an eight-hour workday. (*Id.* at 147.) His report indicates that he gave significant weight to the negative x-ray results in reaching this conclusion. (*Id.* at 148 ("right knee pain X-ray is negative").)

At the hearing, Dr. Mond stated that his review of the evidence indicated that Hale had suffered from "osteoarthritis of the right hip for many years." (R. at 228.) He noted that she did not use a cane, and said that her condition would cause "mild to moderate" interference with walking. (*Id.*) He concluded that there was ultimately "no real good record" by any physician regarding her

hip problems.  (*Id.* at 229.)

**Hyperthyroidism**

While Hale was hospitalized in April of 2001 with an asthma attack, Dr. Horras noted that she had a past medical history of hyperthyroidism.  (R. at 111.)  In April of 2002, Dr. Law determined that Hale was experiencing hyperthyroidism on the basis of her tested levels of certain thyroid hormones.  (*Id.* at 129-30.)  When Dr. Bernardo examined Hale in November of that year, she stated that she was not taking any medication for hyperthyroidism, and denied experiencing any symptoms of that condition, such as palpitations, excess sweating, or congestive heart failure.  (*Id.* at 134.)  Subsequently, Dr. Mond testified at the hearing that although her levels of thyroid hormone were elevated, Hale had "a modicum, if any, [of] physical findings . . . attributable to that."  (*Id.* at 226.)  Hale testified during the hearing that she was taking medicine for her thyroid (*id.* at 222-23), and Dr. Mond concluded that, given that Hale was on medication and was not experiencing any noticeably adverse symptoms, the thyroid condition was "not a disability of any significance."  (*Id.* at 226.)

**Seizure Disorder**

At the time of her hospitalization in April of 2001, Dr. Horras noted that Hale had a history of seizure disorder.  (R. at 111.)  At the time of her interview with Dr. Bernardo in November of 2003, Hale described an eleven-year history of "grand mal type" seizures, but noted that she had not had a seizure for three years.[7]  (*Id.* at 134.)  Dr. Bernardo noted that Hale was taking Dilantin to control her seizure disorder.  (*Id.*)  During the hearing, Dr. Mond testified that Hale was compliant with her Dilantin regime, that she had appropriate levels of that drug in her bloodstream, and that she had not suffered a seizure for more than five years.  (*Id.* at 226.)

**Obesity**

---

[7]        Hale has not claimed to have had any seizures after Dr. Bernardo's examination.

Hale also has a history of obesity. Without shoes, she stands at 66 inches tall. (R. at 135.) She weighed 223 pounds in April of 2002 (*id.* at 129), and 230 pounds in November of 2002, at which time she was described by Dr. Bernardo as "mildly obese." (*Id.* at 135.) In December of 2004, her weight had risen to 235 pounds, giving her a body mass index of 37.9. (*Id.* at 196.) Dr. Mond did not discuss her obesity at the hearing. (*Id.* at 226-29.)

**The Administrative Hearing**

On January 21, 2005, Administrative Law Judge Edward R. Gustafson held a hearing to determine whether Hale was entitled to receive disability benefits. (R. at 212.) Hale testified that she was terminated from her employment as a secretary at West Suburban Hospital due to her illness. (*Id.* at 213.) She said that her illness had caused her to miss days at work, and that her employer fired her for this absence. (*Id.* at 215.) She did not offer any documentation of these missed days, however.

Hale also testified that she was terminated for performance reasons: She said she was criticized for not entering Medicare data properly. (R. at 215.) She also asserted that she was given additional duties after missing work due to her illness, that these duties involved physical tasks such as transporting patients, and that she was unable to perform these new tasks due to her limitations. (*Id.* at 216.)

Hale's attorney described COPD as her "main problem." (R. at 216.) He asserted that Hale was using an oxygen tank "pretty much . . . all the time, 24 hours a day," and that she therefore would be unable to work even a sedentary job. (*Id.* at 217.) He stated that, due to the difficulties of transporting her oxygen equipment, Hale would be unable to take public transit to and from work. (*Id.* at 217-18.)

Dr. Mond also testified at the hearing. After offering opinions relating to each of her claimed conditions, described above, he opined that she was capable of sedentary work with limitations, but not light work. (R. at 229.)

**The ALJ's Findings**

Conducting the five-step test required by 20 C.F.R. § 404.1520(a)(4), the ALJ found that Hale had not engaged in substantial gainful activity since the alleged onset of her disability. (R. at 28.) He also found that her COPD, arthritis and obesity were "severe" conditions within the meaning of 20 C.F.R. § 404.1520(c). (*Id.*) He made no explicit findings regarding whether her hypertension, her pulmonary hypertension, her hyperthyroidism, or her seizure disorder qualified as "severe." (*Id.*)

The ALJ then found that none of Hale's impairments met or equaled the criteria of the Listing of Impairments. (R. at 27, 29.) He wrote that in reaching this conclusion, he had "considered any medical opinions, which are statements from acceptable medical sources, which reflect judgments about the nature and severity of the impairments and resulting limitations." (*Id.* at 27.) The ALJ did not specifically discuss any medical evaluation or opinion individually, did not refer to any listing criteria, and did not explain the reasoning used to reach this conclusion. (*Id.*)

On the issue of Hale's ability to work, the ALJ concluded that Dr. Law's Pulmonary RFC questionnaire, which concluded that Hale had a very limited ability to work, would not be given controlling weight, because it was written "based on an evaluation that was almost one year old." (R. at 28.) He also discounted it because he found it to be internally contradictory, based upon the fact that Dr. Law opined both that Hale experienced "daily mild attacks" of asthma, and that she had a "[m]arked limitation" in her ability to deal with work stress. (*Id.*) He also discounted the RFC prepared by the state agency doctors, including that of Dr. Conroy (*id.* at 146), which stated that Hale could work with almost no limitations, on the grounds that those examiners had not met or questioned Hale. (*Id.* at 28.)

The ALJ ultimately adopted Dr. Mond's conclusion (R. at 229) that Hale was capable of performing sedentary work. (*Id.* at 28.) The ALJ did note, however, that Hale was limited to work that did not involve exposure to pulmonary irritants, as recommended in Dr. Conroy's RFC (*id.* at

150), and to environments that did not involve humidity, extreme temperatures, or fumes. (*Id.* at 29.)

Finally, the ALJ determined that Hale had past relevant work as a secretary. (R. at 28.) He concluded that although her previous work as a secretary had involved substantial lifting, she could work as a secretary "based upon the means in which this job is generally performed in the national economy." (*Id.*) He made no mention of any expert testimony or other sources in concluding that such work was within Hale's capability.

Accordingly, the ALJ found that Hale was not under a disability as defined by the Social Security Act, 20 C.F.R. § 404.1520(f). (R. at 28.) After denying Hale's request for internal review of that decision, the SSA's Appeals Council noted that the ALJ's decision constituted the final decision of the Commissioner of Social Security. (*Id.* at 6.)

## DISCUSSION

In its review of the Commissioner's decision, the court asks whether the ALJ's factual findings are supported by substantial evidence—that is, by the type of evidence that a reasonable person would accept as adequate support for the ALJ's conclusions. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). As part of this review, the court must determine whether the ALJ has articulated a legitimate reason for his decision, by constructing an accurate and logical bridge from the evidence to his conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Although the ALJ need not discuss every piece of evidence in the record, he may not ignore an entire line of evidence that is contrary to his ruling; if he does so, remand is required so that he can more completely state the basis of his decision. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). The court will remand the case for further proceedings if the ALJ's decision lacks evidentiary support, if it is not clear enough to permit meaningful review, or if it fails to confront and explain contrary evidence. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

The determination of whether an individual is disabled under the Social Security Act proceeds in five steps, as follows:

1.    First, the claimant must not be engaged in substantial gainful activity.

2.    Second, the claimant must have medical impairments that are "severe," meaning that the impairment must significantly limit the ability to do basic work activities.

3.    Third, if the claimant's impairment meets or exceeds one of those enumerated in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App. 1., the claimant will be found disabled.

4.    Fourth, if the claimant can still do past relevant work, she will not be found disabled.

5.    Finally, if the claimant can make an adjustment to perform other work, she will not be found disabled; if such an adjustment is not possible, she will be found to be disabled.

*See* 20 C.F.R. § 404.1520(a)(4).  As described in greater detail above, the ALJ found that Hale (1) had not engaged in substantial work activity, and that she (2) was severely impaired by a combination of COPD, arthritis and obesity.  (R. at 28.)  He then found that (3) her medically determinable impairments did not meet or medically equal one of the listed impairments.  (*Id.* at 29.) Finally, because he found that (4) Hale was able to perform her prior work as a secretary, he ruled that she was not disabled without reaching step five.  (*Id.*)

The parties have filed cross-motions for summary judgment.  The Commissioner argues that the ALJ's decision was supported by substantial evidence and should be affirmed. (Def.'s Resp. at 12-13.)  Hale argues that the ALJ erred at steps two, three and four.  (Pl.'s Mem. at 5-13.)  The court will consider each of Hale's allegations of error in turn.

**I.    The ALJ's Step Two Findings Regarding Severity of Impairments**

Hale argues that the ALJ's order was defective because he failed to find to consider whether some of her asserted impairments were severe at step two, including her claimed hypertension, pulmonary hypertension, hyperthyroidism and seizure disorder.  (Pl.'s Mem. at 7.)  The ALJ's order

found that Hale's COPD, arthritis and obesity were "severe" under 40 C.F.R. § 404.1520(c), meaning that those impairments significantly limit the claimant's ability to engage in basic work activities. (R. at 28.) The ALJ made no explicit finding regarding whether Hale's other claimed impairments satisfied this standard, however. (*Id.*) The court addresses the ALJ's treatment of each of Hale's impairments below.

### A.      Pulmonary Hypertension

The ALJ made only brief mention of Hale's claimed pulmonary hypertension: He noted that Dr. Law had made such a diagnosis (R. at 27), but stated that Dr. Law's opinion would not be given controlling weight because it was made almost a year after her examination of Hale, and because it contains some contradictory language. (*Id.* at 28.) The ALJ made no reference to Dr. O'Donoghue's conclusion that Hale was suffering from pulmonary hypertension based upon an examination he conducted in May of 2001. (*Id.* at 197-98.) Nor did he mention Dr. Mond's testimony that "pulmonary hypertension [was] documented" in both Dr. Law's 2003 RFC evaluation (*id.* at 155) and in her notes from her April 23, 2002 examination of Hale (*id.* at 129), and that he "[could not] quarrel with them," except to the extent that the *second* evaluation was not made concurrently with a physical examination. (*Id.* at 228.)

There were, thus, a total of four statements by physicians supporting a diagnosis of pulmonary hypertension in the record, and no opinions to the contrary by any physicians during the relevant period. For the ALJ to build a "accurate and logical bridge" from this evidence to his (implied) conclusion that Hale's pulmonary hypertension was not a severe impairment, he needed to do more than discount a single report. Rather, he would need to show either (1) why none of these opinions were entitled to consideration, (2) why other evidence in the record militated against these reports, or (3) why these reports, if believed, would not support a finding that Hale's pulmonary hypertension was serious enough to be labeled "severe." In the absence of such analysis, the court is unable to assess the ALJ's finding that Hale's pulmonary hypertension did not

constitute a severe impairment.  *Clifford*, 227 F.3d at 872.

### B.    Hypertension

With regard to Hale's hypertension, the ALJ noted that Hale had a history of "markedly elevated blood pressure" but also noted that on one occasion, this result could be attributed to the fact that "she did not take her medication."  (R. at 27.)  He did not otherwise address the conclusions of numerous doctors that Hale suffers from hypertension.  (*Id.* at 111, 129, 166, 196.) There may well be other bases on which to conclude that Hale's hypertension is not a severe impairment: Dr. Mond, for instance, noted that Hale had suffered from hypertension for over twenty years (*id.* at 226), and Hale admits to working until June of 2002.  (*Id.* at 74.)  Furthermore, Dr. Mond noted that Hale's hypertension was controlled with relatively minimal therapy, with no evidence of end organ damage.  (*Id.* at 226.)  But it is not for this court to construct a logical bridge between evidence and conclusions; that is the duty of the ALJ.  *Clifford*, 227 F.3d at 872.  Thus, although the Commissioner is correct that, when a claimant worked while suffering from an allegedly disabling condition, that evidence cuts against a claim for disability benefits, *see Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002), such supporting evidence is not sufficient in itself to sustain the ALJ's decision, if the ALJ has not adequately explained why it overrides contrary evidence.

### C.    Hyperthyroidism

With respect to Hale's allegation of hyperthyroidism, the ALJ noted that Hale had "a history of thyroid problem with no abnormal signs" and that she was "not currently taking any medication" for this condition.  (R. at 27.)  This brief analysis is sufficient, in the court's view.  The statement that there were "no abnormal signs" can be read as a reference to Dr. Mond's conclusion that there were "a modicum, if any, [of] physical findings" associated with hyperthyroidism (*id.* at 226) and Dr. Bernardo's statement that "there are no signs of hyperthyroid state."  (*Id.* at 137.)  Given the absence of any medical opinions in the record stating that Hale was in any way limited by her

alleged hyperthyroidism, the court concludes that the ALJ's brief treatment of this issue was adequate to permit appellate review and that it was supported by substantial evidence.

### D.    Seizure Disorder

Finally, with respect to Hale's seizure disorder, the ALJ noted that Hale had not experienced any seizures within the three years preceding her hearing, and that she had "no abnormal signs." (R. at 27.)   The court concludes that this statement, too, is adequate to permit review, and that it is supported by record evidence.   Hale claims to have become disabled in May of 2002, less than three years before the ALJ issued his decision.   (*Id.* at 74.)   The fact that she had not experienced any seizures or other symptoms within her disability period provides strong evidence that she is not significantly limited by this disorder.   When combined with the fact that no physician opined that Hale was limited in any way by her seizure disorder, the ALJ's implicit finding that the seizure disorder was not a severe impairment was supported by substantial evidence.

Thus, the ALJ adequately explained his implicit findings that Hale was not severely impaired by her alleged seizure disorder and hyperthyroidism, and these findings are supported by substantial evidence.   Absent a more detailed explanation of the ALJ's findings that Hale's claimed hypertension and pulmonary hypertension were not severe, however, this court is unable to review the reasoning supporting that finding.   The Commissioner argues that these defects should not be the basis of a remand, because Hale has not shown that these omissions were outcome-determinative.   It is correct, as the Commissioner argues, that a diagnosis is not necessarily determinative of a disability, because not all diagnosable conditions rise to the level of severe impairments.   *See Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998).   Thus, the fact that Hale has been previously diagnosed with pulmonary hypertension and other conditions do not mean that she is necessarily disabled.   Nevertheless, these diagnoses are evidence in support of a finding of a severe impairment; they may be outweighed by other evidence, but for the ALJ to so find, he must present his reasoning for this court to review.   *See Steele*, 290 F.3d at 941 (stating that "regardless

whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ").

On remand, the ALJ is instructed to make explicit findings regarding whether these conditions number among Hale's severe impairments, and to explain the reasoning that supports those findings.

## II.     The ALJ's Step Three Finding Regarding the Listing of Impairments

Hale argues that the ALJ committed three errors in making his step three finding that her medically determinable impairments do not meet or medically equal any entry in the Listing of Impairments.  (R. at 27, 29.)  First, Hale argues that the ALJ failed to consider whether her additional impairments, when combined with the impairments he found to be severe, would meet or equal a listing at step three.  (Pl.'s Mem. at 7.)  Second, she argues that the ALJ failed to provide the reasoning supporting his step three conclusion that Hale's respiratory impairments did not meet or equal the FEV1 listing criteria for pulmonary function.  (*Id.* at 5-6.)  Third, she argues that the ALJ erred by failing to ask Dr. Mond whether the combination of her impairments met or equaled a listing.  (*Id.* at 8.)  The court finds no error in the ALJ's failure to question Dr. Mond, but concludes that the ALJ did not adequately explain his conclusion that Hale's combination of impairments did not meet or equal any entry in the Listing, and that he did not adequately explain why Listing 3.02(A) did not apply to Hale's COPD.

### A.     Listing Equivalency of Hale's Combination of Impairments

First, Hale argues that the ALJ erred by not considering whether all of her claimed impairments, in combination, met or equaled a listing.  (Pl.'s Mem. at 7.)  An ALJ is required to consider all of a claimant's impairments in combination when making his equivalency determination. 20 C.F.R. §§ 404.1520(d), 404.1526(b)(3).  The ALJ made only a brief comment on this issue:

After reviewing the evidence in the file as well as the testimony at the hearing, the

> Judge finds that the claimant's condition does not meet or medically equal the requirements of any section of the Listing of Impairments. In making this assessment, the undersigned has considered any medical opinions, which are statements from acceptable medical sources, which reflect judgments about the nature and severity of the impairments and resulting limitations.

(R. at 27 (internal citations omitted).) Because the ALJ did not discuss any specific impairments in connection with his listing assessment, the court is uncertain which of Hale's claimed impairments the ALJ did consider in reaching his conclusion.

The Commissioner argues that the ALJ in fact considered all of Hale's conditions in combination (Def.'s Resp. at 8-9), but the court can see no evidence in his opinion to support that contention. The Commissioner cites *Fox v. Heckler*, 776 F.2d 738 (1985) for the proposition that the ALJ's use of the plural "impairments" is sufficient to indicate that he considered the impairments in combination. (Def.'s Resp. 9.) *Fox* did not involve the "mere" use of the plural by an ALJ, however. In *Fox*, a designated physician opined in cursory form that "[t]he severity of the individual's impairment(s) does not meet or equal" a listing, but the ALJ went on to evaluate competing evidence from the claimant's treating physician in significant detail. 776 F.2d at 741-42 (parentheses in original). Here, there was no such analysis; rather, this case more closely resembles the perfunctory analysis provided in *Brindisi ex rel. Brindisi v. Barnhart*, which the Seventh Circuit held was insufficient to permit proper appellate review.[8] 315 F.3d 783, 786 (7th Cir. 2003).

Because an ALJ is required to provide the reasoned basis for his conclusions, *Clifford*, 227 F.3d at 872, the ALJ must address this issue as well on remand, explaining his conclusion that

---

[8]     In *Brindisi*, the ALJ provided the following explanation of his listing determination:

> The claimant has a combination of severe impairments which include: speech and language delays, recurrent otitis media, and ADD. However, none of these impairments meet the requirements of an impairment listed in Appendix 1 to subpart P of regulation no. 4.

315 F.3d at 786 (emphasis omitted).

Hale's impairments do not, in combination, meet or equal a listing.

## B.    Whether Hale's FEV1 Results Met the Listing Value for COPD

Hale's second argument is that the ALJ erred by failing to consider in more detail whether she met or equaled the listing for chronic obstructive pulmonary disease, Listing of Imps. § 3.02(A), which in Hale's case is an FEV1 value of 135 or below.  (Pl.'s Mem. at 6.)  The ALJ made no mention of Listing 3.02(A), despite the fact that it was discussed by Dr. Mond at the hearing.  (R. at 27, 29, 227.)  Failure to mention relevant listings, combined with perfunctory analysis, is an appropriate basis for remand if it frustrates the court's ability to conduct judicial review.  *Brindisi*, 315 F.3d at 786.

The Commissioner, dissecting each of the pulmonary function studies in the record, argues that the evidence demonstrates that Listing 3.02(A) is not applicable.  (Def.'s Resp. at 7.) At the hearing, Dr. Mond testified that there were problems with the first two pulmonary function tests in the record, leaving the third study (which yielded an above-listing result of 144) as the only reliable indicator of Hale's pulmonary function.  (R. at 227.)  These circumstances might well be a sufficient basis on which the ALJ could conclude that Listing 3.02(A) did not apply to Hale, but because this reasoning was not included in the ALJ's opinion, it does not sustain his finding on this issue.  *Steele*, 290 F.3d at 941*; Clifford*, 227 F.3d at 872.

The Commissioner also correctly observes that an ALJ's failure to refer to a listing, by itself, does not justify a remand, citing *Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004).  But there is a critical difference between a simple failure to mention a listing, supplemented by a detailed discussion of relevant evidence, on the one hand, and the failure to refer to a listing combined with an otherwise perfunctory analysis, on the other.  *Id.* at 370.  The second situation has been held by the Seventh Circuit to require a remand.  *See id.*; *Brindisi*, 315 F.3d at 786.  That is the situation here, when the ALJ made no reference at all to the various FEV1 values.  (R. at 27, 29.)  Thus, the court directs the ALJ to address Listing 3.02(A) on remand, and explain the reasoning that supports

17

his finding that it does not apply to Hale's application for disability benefits.

### C. Medical Testimony Regarding Equivalency

Finally, Hale argues that the ALJ erred by failing to ask Dr. Mond whether her impairments were equivalent with a listing. (Pl.'s Mem. at 8.) Dr. Mond discussed several test results that relate to listing values during his testimony, but he did not offer any ultimate opinion regarding whether Hale's combination of symptoms met or equaled any listing. (R. at 227-229.) An ALJ has a duty to make sure that the record is sufficiently well-developed to enable him to rationally determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1527(c)(3); *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). This does not mean that he must always quiz a testifying expert regarding equivalency; there may well be cases where the record is so one-sided that only one conclusion is possible.[9]

Medical testimony regarding equivalency would undoubtedly have been helpful in this case, given an FEV1 value that was close to the listing line (R. at 227), combined with several other potentially significant impairments. Still, it may well be that the ALJ was capable of properly resolving the equivalency issue on the record that was before him. On remand, the ALJ may decide whether or not further testimony from Dr. Mond or another expert is necessary in order for him to make a step three determination that is adequately explained and supported by sufficient evidence.

Thus, on remand, the ALJ must enunciate a reasoned basis for his step three findings, including an assessment of whether Hale's impairments, in combination, meet or equal any relevant listing, and including an assessment of whether Hale's FEV1 scores meet or exceed any listing. The ALJ may, but is not required to, seek additional medical evidence regarding equivalency, if he feels that this is necessary in order to comply with the court's order.

---

[9] Hale cites 20 C.F.R. § 404.1526(b) in support of her argument, but this subsection contains no requirement that an ALJ obtain an expert opinion in order to make an equivalency finding.

III.    **The ALJ's Step Four Finding Regarding Hale's RFC**

Lastly, Hale argues that the ALJ erred in his determination that Hale was capable of performing her prior work as a secretary because his finding was not supported by substantial evidence. (R. at 29.) First, she argues that the ALJ's finding is in conflict with Dr. Law's assessment of her RFC. (Pl.'s Mem. at 8-9.) Second, she argues that the ALJ erred by not permitting her attorney to question Dr. Mond. (*Id.* at 9.) Third, she argues that the ALJ erred by finding that her testimony regarding her limitations was not credible. (*Id.* at 10.) Fourth, she argues that the ALJ did not rely on adequate evidence of the demands of secretarial work as that job is performed in the national economy. (Id. at 11-12.)

A.    **Conflict with Dr. Law's Evaluation**

Hale first challenges the ALJ's failure to adopt Dr. Law's RFC assessment. (Pl.'s Mem. at 8-9.) The ALJ noted that Dr. Law's opinion was based on an evaluation that was almost one year old. (R. at 28.) Furthermore, the ALJ believed that her report was internally inconsistent, based on the purported contradiction between Dr. Law's statement that Hale experienced "daily mild attacks" of asthma, and her conclusion that Hale had a "[m]arked limitation" in her ability to deal with work stress. (*Id.* at 28, 155-57.) The court is uncertain that these findings are inconsistent: Dr. Law's statement regarding "mild attacks" was in response to a question about Hale's asthma; the overall RFC (and presumably the answer regarding work stress) was based on Dr. Law's diagnosis that Hale was suffering from pulmonary hypertension. (*Id.* at 155-57.) Dr. Law's opinion may be internally contradictory in other ways; for instance, Dr. Law stated that an average asthma attack would incapacitate Hale for "a few weeks" but also stated that Hale suffered "daily mild attacks." (*Id.* at 156.)

In any event, although a treating physician's opinion is important, it is not determinative, especially given the risk that a patient's own physician will shade her findings so as to ensure her patient access to benefits. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (collecting

cases). The ALJ was entitled to weigh Dr. Law's recommendations against those of other physicians and find the other RFCs more reliable. *Id.* The ALJ rejected Dr. Law's conclusions that Hale could not sit for more than four hours at a time (and hence, that she could not perform even sedentary work, which generally involves about six hours of sitting in an eight-hour day, *see* S.S.R. 96-9p, 1996 WL 374185, at *3). (R. at 28.) In rejecting this report, the ALJ relied on the absence of any documented complaints by Hale of difficulty sitting, as well as on Dr. Mond's finding that Hale was capable of sedentary work with limitations. (R. at 28, 229.) The court concludes that the ALJ "minimally articulate[d] his reasons for . . . rejecting" Dr. Law's evidence, and stated a reasonable basis for having done so, which is all that is required. *See Schmidt*, 496 F.3d at 842-43 (quoting *Skarbeck v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)).

### B. Failure to Question Doctor Mond Regarding Hale's RFC

Hale argues that the ALJ erred by failing to question Dr. Mond regarding her RFC, and because her attorney never had the opportunity to question Dr. Mond on this topic. (Pl.'s Mem. at 9.) With respect to the failure of the ALJ to question Dr. Mond, the ALJ is under no duty to do so, except when the record does not contain sufficient evidence on which a determination of RFC can be made. *See* 20 C.F.R. § 404.1527(c)(3); *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). In addition to Dr. Mond's own extensive testimony regarding Hale's impairments (R. at 226-29), the ALJ had access to two RFC assessments (R. at 146-53, 155-61), the consultative report of Dr. Bernardo (R. at 133-45), an extensive set of Hale's medical records over the past five years, and Hale's own testimony. Surveying this evidence, the court cannot conclude that the failure to further question Dr. Mond made it impossible for the ALJ to adequately determine Hale's RFC.

Hale also asserts that her attorney was denied the opportunity to question Dr. Mond, on the basis of the following exchange at the close of the hearing:

> Q [by ALJ] What type of work or activity is she up to, Doctor?
> A [by Dr. Mond] I think sedentary work with limitations.
> Q All right. She should no do light work?

A  No, sir.
Q  So, she could not – she would grid out at age 50.  Is that (INAUDIBLE)?
ATTY [for Hale]: Yeah, assuming that you're going to (INAUDIBLE), yeah.
Thank you for your help.
ALJ: All right, then.  That will be the end of the hearing.

(R. at 229.)  In Hale's view, this exchange shows that her attorney thought the ALJ had decided in

her favor, and thus had no reason to ask for permission to question Dr. Mond.  (Pl.'s Reply at 6 n.4;

Pl.'s Mem. at 9.)

A claimant has the right to question witnesses at her administrative hearing.  20 C.F.R.

§ 404.950(e).  Hale was not denied this right, however; rather, the record reflects simply that her

attorney did not ask, at any point, for permission to question Dr. Mond.  (R. at 226-29.)  The fact

that Hale's attorney may have believed he would get a favorable resolution of his claim does not

absolve him of his duty to seek to present all evidence that he believes will advance his client's

case.  Furthermore, the ALJ might reasonably have understood the statement "Thank you for your

help" as an indication that Hale's attorney had no wish to present further evidence.  The record

simply does not reflect any attempt to cross-examine Dr. Mond, or any indications that the ALJ

would have refused such a request.  Thus, Hale was not denied her right to question Dr. Mond.

### C.    Hale's Credibility Regarding Her RFC

Hale argues that the ALJ erred by concluding that her testimony regarding her RFC was not

credible.  (Pl.'s Mem. at 10-11.)  Specifically, she argues that the ALJ improperly rejected her

testimony that she had missed days at work due to her illness, and that she needed to use oxygen

"both day and night."  (*Id.* at 10.)

The court notes, first, that the ALJ made no specific ruling that Hale was not credible

regarding her limitations.  Hale argues that the fact that the ALJ made no mention of her testimony

regarding her work absences, or her testimony regarding her need to use oxygen during the day,

demonstrates that the ALJ made an implicit finding that her testimony was not credible.  (Pl.'s Mem.

at 11.)  It is equally possible, however, that the ALJ believed that, in spite of these restrictions, Hale

was capable of sedentary work with no exposure to pulmonary irritants, temperature extremes, humidity or fumes.  (R. at 29.)

The court is therefore less concerned with any hidden credibility finding than with the question of what, if any, relevance Hale's work absences or use of oxygen had for her RFC.  If the ALJ was rejecting her testimony on these limitations, he would need to do so on the record and state his basis for doing so.  *See* S.S.R. 96-7p, 1996 WL 374186, at *1-3.  If he instead concludes that such limitations are consistent with his determination that Hale is capable of sedentary work with environmental limitations, he still has a duty to articulate a logical bridge between the evidence and that conclusion.  *Clifford*, 227 F.3d at 872.  Thus, on remand, the ALJ must either make an explicit credibility finding on these issues, or else explain why the limitations claimed by Hale are consistent with a limitation to sedentary work with environmental limitations.

### D.    The ALJ's Determination Regarding the Demands of Secretarial Work

Finally, Hale argues that the ALJ erred by concluding that she could perform secretarial work, as such jobs are generally performed in the national economy.  (R. at 28-29.)  Hale makes three arguments on this issue.  The first requires little discussion: Hale urges that the ALJ acted inappropriately by failing to receive any evidence regarding the demands of secretarial work as it is generally performed.  (Pl.'s Mem. at 11.)  It is the claimant's burden to prove that she is unable to return to her past work as it is generally performed, however, *see Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984), so any inadequacy of proof on the demands of secretarial work does not undermine the ALJ's ruling.

Hale's remaining arguments are more significant.  She notes that the ALJ failed to compare the demands of Hale's prior secretarial work with her RFC.  (Pl.'s Mem. at 11-12.)  In making a finding that a claimant can still do past relevant work, the ALJ is required to compare the demands of that prior job with the claimant's RFC.  *Smith v. Barnhart*, 388 F.3d 251, 252-53 (2004).  The ALJ here noted that secretarial work does not involve lifting heavy loads (R. at 28), but made no mention

22

of Hale's other restrictions, a matter that should be addressed on remand.

Finally, Hale argues that the ALJ erred by characterizing her prior work as secretarial work, rather than as a combination of secretarial and transportational work. (Pl.'s Mem. at 12.) The court believes that this finding of fact is probably supported by the record; Hale, after all, testified that the more physical elements of her employment, such as transporting patients, were added only after she was hospitalized and absent from work. (R. at 215-16.) Her testimony suggests that this admission occurred close to the end of her 23 years of employment as a secretary.[10] (*Id.*) Thus, the ALJ might have concluded that Hale did work that was primarily secretarial within the relevant period.

Unfortunately, the ALJ did not offer any analysis regarding the best characterization of Hale's past relevant work; rather, he stated simply that she had "past relevant work as a secretary." (*Id.* at 28.) In order to justify this finding of fact, the ALJ would need to address Hale's testimony that her job combined both aspects of secretarial work and more physically laborious functions, and either explain why a finding that she has past relevant work as a secretary is consistent with that testimony, or else explain why that testimony is not credible. No matter how well supported his decision was, it is for the ALJ, not this court, to supply a reasoned basis for the determination that Hale's prior work was secretarial in nature, and not a composite of secretarial and transportational work. *Clifford*, 227 F.3d at 872.

Thus, on remand, the ALJ must articulate the reasoned basis for his findings that Hale has past relevant work as a secretary, and that her RFC is compatible with secretarial work as it is performed in the national economy. He must also provide a reasoned discussion regarding whether Hale's hypertension and pulmonary hypertension qualify as additional severe impairments. Finally, he must build a logical and accurate bridge from the evidence in this case to his conclusions

---

[10] The record contains only one set of notes from a hospital admission: Hale was admitted to West Suburban Hospital in April of 2001 for asthma and pneumonitis. (R. at 111.)

that Hale's combination of impairments do not meet or equal any entry in the Listing of Impairments, and more specifically, he must explain why Hale's COPD does not meet or equal Listing 3.02(A). He may, but is not required to, solicit additional evidence or testimony if it will facilitate compliance with the court's order.

## CONCLUSION

For the reasons stated above, Hale's motion for summary judgment [17] is granted, the Commissioner's cross-motion [23] is denied, and the case is remanded to the SSA for further proceedings consistent with this opinion.

ENTER:

Dated:  December 21, 2007

_____
REBECCA R. PALLMEYER
United States District Judge